AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

```
LODGED
CLERK, U.S. DISTRICT COURT

11/26/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY
```

# UNITED STATES DISTRICT COURT

for the

Central District of California

```
FILED
CLERK, U.S. DISTRICT COURT

11/26/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VV _____ DEPUTY
```

United States of America

v.

SHENGHUA WEN,

        Defendant(s)

Case No.   2:24-MJ-07105-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on a date unknown and continuing through on or about September 6, 2024, in the Counties of Los Angeles and San Bernardino in the Central District of California and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a), (c) | Conspiracy to Violate the International Emergency Economic Powers Act |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/ Nick Baranishyn_
*Complainant's signature*

Nick Baranishyn, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     11/26/2024

*Judge's signature*

City and state:  Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

### AFFIDAVIT

I, Nick Baranishyn, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Shenghua Wen ("WEN") for a violation of 50 U.S.C. § 1705(a), (c); 31 C.F.R. §§ 510.206(a), 510.212(b); and Executive Orders 13466 and 13722: Conspiracy to Violate the International Emergency Economic Powers Act.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

### II. BACKGROUND OF SPECIAL AGENT NICK BARANISHYN

3.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2018.  Since joining the FBI, I have received training in investigations of criminal law violations, including hundreds of hours of formal training at the FBI Academy in Quantico, Virginia.  I have also received formal training in federal laws

1

and regulations relating to export control violations and
counterintelligence investigations.

4.   I am currently assigned to an investigative squad
within the FBI's Counterintelligence Division, which is
responsible for conducting investigations for violations of
federal laws involving, *inter alia*, counter-proliferation
investigations against foreign adversaries who attempt to
unlawfully obtain U.S. technologies, evade U.S. sanctions, and
procure U.S. goods for military end-use.  I also investigate
violations of U.S. export and sanctions laws related to military
items, controlled "dual-use" commodities, and sanctioned or
embargoed countries.  In addition, as an FBI SA, I have
personally conducted and assisted on numerous investigations
involving violations of federal laws involving firearms.

### III.  SUMMARY OF PROBABLE CAUSE

5.   At the direction of government officials from the
Democratic People's Republic of Korea ("DPRK" or "North Korea"),
WEN conspired with others known and unknown to procure firearms,
ammunition, and export-controlled technology, with the intention
of shipping the items to North Korea.  WEN and his co-
conspirators successfully exported at least two shipments of
firearms and ammunition to North Korea by concealing the items
inside shipping containers that were shipped from Long Beach,
California, through Hong Kong, China, to North Korea.

6.   On August 14, 2024, federal agents seized from WEN's
home in Ontario, California, two devices that WEN admitted he
procured to send to the North Korean government for its military

use: (1) a Serstech Arx mkII Pharma device — a chemical threat identification device; and (2) an ANDRE Deluxe Near-Field Detection device — a handheld broadband receiver that detects known, unknown, illegal, disruptive, or interfering transmissions (according to the manufacturer, it is "portable, non-alerting, and ideal for locating hidden eavesdropping devices").

7.   On September 6, 2024, federal agents seized from WEN's van parked outside his home 50,000 rounds of 9mm ammunition that WEN admitted he procured to send to North Korea at the direction of North Korean government officials.  WEN is a Chinese national who is illegally in the United States and is therefore prohibited from possessing any firearms or ammunition.

8.   As detailed below, licenses from the Department of the Treasury's Office of Foreign Assets Control ("OFAC") and Department of Commerce, Bureau of Industry and Security ("BIS") are required to export ammunition, firearms, and the above-described devices to North Korea, and WEN does not have any licenses from OFAC or BIS for any exports.

### IV. BACKGROUND ON SANCTIONS AGAINST NORTH KOREA

9.   The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Section 1701, et seq., grants the President the authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Section 1705 provides that it is a crime to willfully violate, attempt to violate, conspire

to violate, or cause a violation of any license, order, regulation, or prohibition issued under Chapter 35 of Title 50.

10. Pursuant to IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions involving North Korea. Specifically, on June 26, 2008, the President issued Executive Order ("E.O.") 13466, finding that that "the existence and risk of the proliferation of weapons-usable fissile material on the Korean Peninsula constituted an unusual and extraordinary threat to the national security and foreign policy of the United States" and declaring a "national emergency to deal with that threat." In two subsequent Executive Orders in 2010 and 2011, the President imposed additional sanctions with respect to North Korea. See Executive Orders 13551 (Aug. 30, 2010) and 13570 (Apr. 18, 2011). To implement those Executive Orders, OFAC issued the North Korean Sanctions Regulations (the "NKSR"). 31 C.F.R. Part 510.

11. On February 18, 2016, the President signed into law the North Korea Sanctions and Policy Enhancement Act of 2016 ("NKSPEA"), codified at 22 U.S.C. § 9201, et seq., to address the North Korean weapons of mass destruction threat.

12. In addition to the enactment of the NKSPEA, the President, pursuant to IEEPA, issued a series of three Executive Orders in 2015, 2016, and 2017 further regulating transactions involving North Korea. See Executive Orders 13687 (Jan. 2, 2015); 13722 (Mar. 15, 2016); and 13810 (Sept. 21, 2017). On March 5, 2018, OFAC amended the NKSR and reissued them in their

4

entirety to implement those Executive Orders and to reference the NKSPEA.  See 83 Fed. Reg. 9182 (Mar. 5, 2018).

13.  The NKSR implements a comprehensive sanctions regime against North Korea.  Absent permission from OFAC in the form of a license, the NKSR prohibits, among other things, the exportation or re-exportation, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, services, or technology to North Korea.  31 C.F.R. § 510.206(a).  This prohibition applies to services, including financial, brokering, freight forwarding, or transportation services, performed on behalf of a person in North Korea or the government of North Korea or where the benefit of such services is otherwise received in North Korea.  31 C.F.R. § 510.405. Additionally, the benefit of services performed anywhere in the world on behalf of the North Korean government is presumed to be received in North Korea.  Id.

14.  The NKSR prohibits any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate or any conspiracy formed to violate any of the prohibitions set forth in the NKSR.  31 C.F.R. § 510.212.

## V.  STATEMENT OF PROBABLE CAUSE

15. Based on my review of law enforcement reports and evidence, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

5

A.     **WEN Conspired to Illegally Export Firearms,
        Ammunition, and Technology to North Korea at the
        Direction of the North Korean Government**

16.    During a series of Mirandized interviews, WEN admitted
to exporting firearms and ammunition to North Korea at the
direction of the North Korean government.

17.    As discussed in more detail below, WEN is a Chinese
national who entered the United States in 2012 on a student visa
and stayed in the United States illegally once his visa expired.
During a Mirandized interview on September 6, 2024,[1] WEN
explained that he met North Korean government officials at two
separate North Korean Consulates in China before he came to the
United States.  Online public searches for North Korean
Consulates in China show that in addition to its embassy in
Beijing, North Korea has consulates in Dandong, Shenyang, and
Hong Kong, China.  According to WEN, during these meetings at
the North Korean Consulates in China, North Korean government
officials directed WEN to procure goods on behalf of the North
Korean government.  WEN explained that he knew the individuals
with whom he met were North Korean government officials because

---

[1] On September 6, 2024, I, along with FBI SA Jason To and
Defense Criminal Investigative Service SA Beau Menvielle,
interviewed WEN at the Hyatt Place Hotel in Ontario, California.
WEN is a native Mandarin Chinese speaker, so the interview was
conducted with the interpretation assistance of FBI Mandarin
Chinese Interpreter Jeffery Wu.  Before the interview, FBI
Interpreter Wu read WEN his Miranda Rights, which WEN confirmed
he understood and waived.  I interviewed WEN, along with other
law enforcement officers, on multiple occasions with the
assistance of a Mandarin interpreter.  Each interview referenced
in this affidavit was recorded.

of the North Korean country apparel they were wearing and because he was in an official North Korean building.  WEN stated that he was likely selected to procure goods on behalf of the North Korean government because he was good at smuggling.

18.  During a Mirandized interview on August 14, 2024, WEN explained that about two years prior to the interview, two North Korean individuals who lived in China contacted him.  WEN identified these individuals as "Jin Yong Nan" and "Cui."  After Jin Yong Nan returned to North Korea from China due to health issues, WEN stayed in contact with Cui via the encrypted messaging platform Wickr.  WEN explained that Cui wanted WEN to purchase and export firearms from the United States to North Korea via Hong Kong, China.  WEN further explained that Jin Yong Nan and Cui were North Korean government officials because, according to WEN, the only people in North Korea who can do this type of activity are in the government.  Based on my training and experience, participation in the interview, and knowledge of the investigation, when WEN stated that "only government people can do *this kind of thing*," he was referring to procuring weapons for North Korea.  (Emphases added.)

19.  WEN admitted, during the August 14, 2024 interview, that he had previously shipped two containers of firearms and other items from Long Beach, California, to North Korea via Hong Kong, China, and that these shipments took place in October 2023 and December 2023.  According to WEN, both containers were shipped out of Long Beach, California, contained weapons, and were ultimately smuggled into North Korea.  WEN explained that

7

he used the same freight forwarder ("Freight Forwarder 1") for both of these shipments.

20. WEN also explained that North Korean government officials provided him with the money for the containers and the shipping fees that were used to ship firearms to North Korea. WEN explained that the money was wired from a bank in China to Hong Kong and then deposited into business and personal bank accounts belonging to Wen's partner ("Individual 1"). According to WEN, North Korean government officials wired approximately two million U.S. dollars to purchase firearms and other products for the North Korean government.

21. To procure weapons for North Korea, WEN stated that around May 2023, WEN purchased AK5000 INC (Super Armory) ("AK5000"), a Federal Firearms Licensee ("FFL"), for approximately $150,000. WEN explained that he used Individual 1's name as the business owner of AK5000 to register the FFL with the Texas Secretary of State. Texas Secretary of State records, which I have reviewed, confirm Individual 1 is the registered agent for AK5000. WEN claimed Individual 1 did not know his/her name was used on the AK5000 FFL registration filings. WEN admitted that one of his North Korean contacts sent $150,000 to WEN through intermediaries to pay for the FFL.

22. WEN also stated that he knew he could not purchase firearms directly so he used other people to purchase the firearms. WEN explained that he knew that if he attempted to purchase firearms, the firearm stores would contact the ATF. WEN further stated that it was a simple process for him to

8

purchase firearms.  Once the straw purchasers gave WEN the firearms, he transported them to California, packed the firearms into a shipping container, and shipped the container to China, knowing that it would be transferred to North Korea.  During the September 11, 2024 interview, WEN explained that he purchased many of the firearms that he sent to North Korea in Texas and that he drove the firearms from Texas to California on three separate trips.  WEN admitted that he knew sending firearms and ammunition to North Korea is illegal.

23.  Based on my review of WEN's iPhone,[2] the phone contains images and messages related to a container that was shipped out of the Long Beach Port in December 2023 (the "December 2023 Firearms Shipment").  One of these images is a Bill of Lading from Freight Forwarder 1.  The Bill of Lading lists a container tracking number of OEH-20154.  U.S. Customs and Border Protection records, which I have reviewed, show that a container matching this same tracking number, OEH-20154, was shipped from the Port of Long Beach, California, on December 4, 2023.  Shipping records also show that WEN falsely reported to U.S. authorities that the shipment consisted of a "refrigerator."

24.  I also reviewed numerous images from WEN's iPhone regarding the December 2023 Firearms Shipment.  Some of these

---

[2] During the August 14, 2024 Mirandized interview, WEN stated he had an iPhone and a Samsung cellphone and admitted he used the devices to communicate with North Korean government officials about weapons he was supposed to purchase on behalf of the North Korean government.  WEN consented to turn over the two cellphones to the FBI and signed a consent to search form.  The phones were subsequently seized by the FBI.

images included the vessel number ONE IBIS #0031W, as well as images tracking the shipment of a vessel named ONE IBIS.

25.   WEN's iPhone also contains Telegram messages in Chinese between WEN and a broker in China about shipments destined for North Korea, including the December 2023 Firearms Shipment.[3]  In these messages, WEN asked the broker to check on the status of the cargo.  The broker explained that two of them (referring to the shipments) had already "passed" and that he would check on the third.  In another message, the broker told WEN that his "container arrived in Hong Kong today.  It's waiting to be unpacked and then it can be transferred."  These messages also contained a screenshot showing that the December 2023 Firearms Shipment arrived in Hong Kong, China, on "2024-01-01 11:30."

26.   Additionally, the text messages between WEN and the broker in China show that the December 2023 Firearms Shipment was shipped from Hong Kong to North Korea.  For example, the broker sent WEN a copy of the Bill of Lading that shows the December 2023 Firearms Shipment would be loaded in Hong Kong and

---

[3] The content of the messages have been translated from Chinese to English.

that the Port of Discharge — the destination — would be "NAMPO," which is a city in North Korea (image below).



27.   In the Telegram message chain, there is also a communication between the broker and WEN about another shipment that WEN was planning to send.  WEN sent an image of a shipping label to the broker with an address in Hong Kong.  WEN listed the return address as a property in Brawley, California, which is the same address of a property where WEN, during a Mirandized interview, admitted he stored devices that he used to communicate with North Korean government officials.  Later in the chain, the broker sent WEN a photo of the package with that same shipping label and stated, "received."

28.   Based on my review of contents from WEN's second cellphone, a Samsung cellphone, it contained numerous Wickr messages between May and June of 2024, between WEN and several co-conspirators with images of firearms and electronic devices.  These messages were mostly in Chinese.  In some of those messages, WEN sent a description of the devices regarding the timeframe for which the product could be shipped.  Photos of

11

some of these items are included below.[4]  In addition, these
Wickr threads also showed records of placed calls using the
application.

 

_____

[4] Based on my communications with HSI SA Bauerle, it appears
that the second and third images (the ball and box with the stem
handle) are likely the Gimbal, Central Electronic Unit, and hand
controller of the STAR SAFIRE, a FLIR Systems Incorporated
product.  Agents have received a first level license
determination from the Directorate of Defense Trade Controls
stating the STAR SAFIRE is a defense article on the United
States Munitions List, Category XII(c)(3), and is controlled for
export under the International Traffic in Arms Regulations.



29.  Based on my training and experience and the context of
the communications between WEN and his co-conspirators, I
believe that WEN was representing to his co-conspirators that he
could obtain and/or ship these items to North Korea.

30.  WEN's iPhone also contained evidence that he was
researching other technology to send to North Korea.  For
example, the iPhone contains emails and text messages from
January 2024 to April 2024, between WEN and a U.S.-based broker
about obtaining a civilian plane engine.  Specifically, WEN
emailed the broker on several occasions to arrange a meeting to
examine the plane.  Additionally, there are several text
messages on WEN's iPhone concerning price negotiation for the
plane and its engine.  Lastly, WEN's iPhone contained several
images of different civilian plane engines and communications
with at least one other person that WEN had contacted to procure
civilian plane engines.  Notably, during the September 11, 2024

13

Mirandized interview, WEN stated that North Korean government officials directed him to purchase U.S. civilian plane engines for the North Korean military.  According to WEN, these engines would be used to help develop the North Korean military drone program.

31.  During the interview on September 6, 2024, WEN explained that he believed the North Korean government wanted the weapons, ammunition, and other military-related equipment to prepare for an attack against South Korea.  He also explained that the North Korean government wanted WEN to obtain military uniforms for the North Korean government, which would subsequently be used by the North Korean military to disguise their soldiers to conduct a surprise attack on South Korea. Based on my review of WEN's iPhone, it contains numerous images of people in U.S. military uniforms.

B.    **The FBI Seized Two Electronic Devices and 50,000 Rounds of Ammunition from WEN's Home in Ontario, California**

32.  During the August 14, 2024 interview of WEN, in which I participated, WEN stated that he had two cardboard boxes containing two devices at his home in Ontario, California, that he purchased on behalf of, and to ship to, the North Korean government.  WEN explained that he purchased both the devices at the request of North Korean government officials, that he was planning to ship these devices to North Korea at their direction, and that North Korea intended for its military to use these items.  WEN further admitted that he knew sending the

14

devices to North Korea is illegal.  WEN consented to turning the devices over to the FBI and signed a consent to search form. Based on my conversations with FBI agents and my review of reports and other information, that same day, FBI agents went to WEN's home in Ontario, California, and seized a Serstech Arx mkII Pharma (photo on the left below) and ANDRE Deluxe Near-Field Detection Receiver (photo on the right below).

 

33.  Based on information from DCIS SA Menvielle and the manufacturer's public website: The Serstech Arx mkII Pharma ("Arx mkII") is a handheld Raman Spectrometer manufactured by Serstech of Lund, Sweden.  The Arx mkII is a chemical threat detection device designed for field operations to identify explosives, narcotics, chemical warfare agents, hazardous materials, and biotoxins present in certain environments.  Based on my review of WEN's iPhone, it contains documentation regarding the purchase of the ANDRE.

34.  Based on information from DCIS SA Menvielle and information on the manufacturer's public website: The ANDRE Deluxe Near Field Detection Receiver ("ANDRE") is manufactured

15

by Research Electronics International of Cokeville, Tennessee.
The ANDRE is a handheld receiver that detects known, unknown,
illegal, disruptive, or interfering transmissions.  It is
designed to locate radio frequency infrared and other types of
transmitting devices.  According to the manufacturer, it is
"portable, non-alerting, and ideal for locating hidden
eavesdropping devices."

35.  During the September 6, 2024 interview, WEN admitted
to falsifying the purchase order documents to obtain the Arx
mkII Pharma and ANDRE for North Korea.  WEN admitted that he
falsified the documents because he knew that he would not have
been able to legally purchase the devices or send them to North
Korea.

36.  The FBI also seized approximately 50,000 rounds of
ammunition from WEN's home.  Specifically, during the interview
on September 6, 2024, WEN admitted that he procured 50,000
rounds of 9mm ammunition at the request of North Korean
government officials to ship to North Korea and that WEN was
storing the ammunition in his white Ford van parked in the
driveway at his home, located in Ontario, California.  WEN
subsequently consented to the search of his van and the seizure
of the ammunition and signed a consent to search form.

37.  During the interview, WEN explained that he was
supposed to ship the ammunition to North Korea but had not yet
done so.  Based on my communications with FBI agents and my
review of reports and other information, FBI agents subsequently

16

went to WEN's home and seized the 50,000 rounds of 9mm ammunition from WEN's van.

38.    During the September 11, 2024 interview, WEN stated that he purchased 20,000 rounds of the 9mm ammunition that the FBI seized from his van from a gun store in Arizona, and that he drove that ammunition from Arizona to his house in Ontario, California.    WEN explained that he purchased the other 30,000 rounds of 9mm ammunition that the FBI seized from his van from an Ace Hardware near Sacramento, California, and that he drove that ammunition to his home in Ontario, California.

C.    **A License is Required to Export Firearms, Ammunition, and the Seized Devices to North Korea, and WEN Did Not Have any License to Do So**

39.    Based on my communications with DCIS SA Menvielle, Homeland Security Investigations ("HSI") SA Bryan Bauerle, and my review of license determination reports from BIS and other reports, I know the following: The Serstech Arx mkII is controlled for Anti-Terrorism reasons and a BIS license is required for the export of this item to North Korea.  The ANDRE Deluxe Near-Field Detection device is also controlled for Anti-Terrorism reasons and a BIS license is required for the export of this item to North Korea.  Additionally, to export either item to North Korea, a license from OFAC is required.  Based on my communications with HSI SA Bryan Bauerle, a license is also required from both BIS and OFAC to export ammunition and firearms to North Korea.

40.    Agents conducted database checks to identify if any exports had been filed under the name WEN, Shenghua or JS

Trading.  Records indicated that no exports have ever been filed under that name or entity.

41.  Based on my communications with HSI SA Bauerle, an export license history request was made to BIS for the following: WEN and JS Trading, which was the company WEN listed on the end-user agreement forms that were submitted to purchase both the ANDRE and the Arx mkII.  Agents received the results of the query, which certified that there were no records of any licenses issued to WEN or JS Trading, dating back to October 2012.

42.  The HSI Counterproliferation Investigations Division requested that OFAC provide a license history check regarding WEN and JS Trading.  The search disclosed no responsive records of applications submitted by or on behalf of, and no OFAC licenses issued to WEN or JS Trading.

D.   **WEN is a Chinese National in the United States Illegally and is Thus Prohibited from Possessing Firearms and Ammunition**

43.  Based on my communication with HSI SA Bauerle, WEN is a Chinese national who entered the United States in 2012 on a student visa.  WEN's student visa was valid from December 5, 2012 to December 3, 2013.  After WEN's student visa expired, he remained in United States illegally.  Based on information from the Department of Homeland Security, WEN was ordered removed from the United States in 2018.  Following a 2021 arrest, WEN signed a form acknowledging his overstay status.  Additionally, during the September 11, 2024 interview, WEN admitted that he knew it was illegal to remain in the United States after his

18

student visa expired.  As someone illegally present in the

United States, I know that it is illegal for WEN to possess any

firearms or ammunition.  See 18 U.S.C. § 922(g)(5).

## VI. CONCLUSION

44.  For all of the reasons described above, there is

probable cause to believe that WEN has committed a violation of

50 U.S.C. § 1705(a), (c); 31 C.F.R. §§ 510.206(a), 510.212(b),

and Executive Orders 13466 and 13722: Conspiracy to Violate the

International Emergency Economic Powers Act.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __26__ day of
November 2024.

_____
HON. Margo A. Rocconi
UNITED STATES MAGISTRATE JUDGE

19